# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

| | |
|---|---|
| DEWEY S. SOWERS, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) **Civil Action No.  4:19-cv-00039** |
| v. | ) |
| | ) |
| BASSETT FURNITURE | ) |
| INDUSTRIES, INCORPORATED | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT BASSETT FURNITURE INDUSTRIES, INCORPORATED'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW your Defendant, Bassett Furniture Industries, Incorporated ("Bassett"), by and through its counsel, and files this its Brief in Support of Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.   Procedural History

Plaintiff, Dewey S. Sowers ("Plaintiff"), is a former employee of Bassett Furniture Industries, Incorporated, having quit without due notice on October 12, 2018. On September 16, 2019, Plaintiff filed a complaint (the "Complaint") against Bassett based upon alleged violations of the Family and Medical Leave Act, as codified under Title 29 U.S.C. §§ 2601 et seq. ("FMLA"), and the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 et seq. and the ADA Amendments Act of 2008 ("ADA"). Plaintiff asserted claims for: discrimination and retaliation in violation of the FMLA (Count I); interference in violation of the FMLA (Count II); discrimination and retaliation in violation of the ADA (Count III); failure to accommodate in

violation of the ADA (Count IV); and interference in violation of the ADA(Count V).

Plaintiff seeks damages against Defendant in the form of equitable relief, compensatory, liquidated and/or punitive damages, together with prejudgment interest from the date of Mr. Sowers' demotion on July 10, 2018, and costs and attorneys' fees.

## II. Statement of Facts

Plaintiff, a resident of Bassett, Virginia, was hired for a second time by Bassett on August 5, 2013 as a Utility Major at Bassett's Plant 11 located in Martinsville, and subsequently was placed in the position of Group Leader or "Lead Person." (Complaint, ¶¶5, 8). He remained employed by Bassett until he quit on October 12, 2018 (Complaint, ¶ 46).

In January, 2014, February, June and July of 2014, Sowers took FMLA leave on numerous occasions for personal and for family illness. (*See* Excerpts from Sowers' personnel file from Bassett ("personnel file") attached as Exhibit 1).

In August 2014, Bassett gave Sowers a positive review of his job performance. (*See* personnel file attached as Exhibit 1). However, Sowers's job performance declined thereafter, compelling his supervisor and human resources department to counsel him to improve his deficiencies as Lead Person, namely his failure to properly supervise the Chair Box Line, which resulted in production and delivery problems with certain orders. (*See* Affidavit of Sherman Moran ("Moran Affidavit") at Exhibit 3 and Affidavit of Jeannett Spencer ("Spencer Affidavit") at Exhibit 4 and Affidavit of John E. Bassett, III ("Bassett Affidavit") at Exhibit 8). Plaintiff confirmed in sworn testimony that he was counseled about this deficiency "about four or five times." (*See* Excerpt of Transcript of Dewey Sowers Deposition ("Sowers Deposition"), p. 40 at Exhibit 10). Plaintiff further acknowledged that he had been counseled about improving his

supervision of the Chair Box Line even before his surgery in August, 2017 and attendant leave. (*See* <u>Sowers Deposition,</u> p. 166 at Exhibit 10). And Sowers further testified his supervisors had likewise talked to him about handling/supervising the whole Chair Box Line, not just one end. (<u>Sowers Deposition</u>, p. 45 at Exhibit 10).

On August 4, 2017, Sowers requested and Bassett granted a leave of absence to begin on August 9, 2017. (*See* <u>personnel file</u> at Exhibit 1). On August 9, 2017, Sowers had surgery on his right foot (<u>Complaint</u>, ¶11). Plaintiff requested and Defendant approved FMLA and short-term disability leave attendant to surgery to begin on or about August 9, 2017 and end on or about October 31, 2017. (<u>Complaint</u>, ¶12)

Plaintiff alleges that, in September, 2017, some two weeks after his surgery and while he was still recovering, Bassett requested that he attend a one-day training seminar at work, vowing to accommodate his attendance by providing a chair and a cushion to rest his foot on. Plaintiff did not attend. (<u>Complaint</u>, ¶13 and <u>Sowers Deposition</u>, p.35 at Exhibit 10).

On November 1, 2017, Plaintiff's doctor cleared him to return to restricted duty, namely, for a limited time period, Mr. Sowers needed a sit down or limited standing job. (<u>Complaint</u>, ¶13).

After careful review of Mr. Sowers's restrictions, Bassett informed Mr. Sowers that it did not have an open position for which Sowers was qualified and that would have permitted Sowers to work in a seated position for hours during the work day. (<u>Complaint</u>, ¶14) This review included an exchange between Mr. Sowers and HR director, Jeannett Spencer. Namely, after Sowers presented Spencer a doctor's note with such significant restrictions that Spencer could think of no job available, she asked Sowers if he was familiar with any job at the plant

that he could do, and Sowers quickly responded no. He then requested to work in the main office for Jeb Bassett, but Spencer was not aware of any main office job for which Sowers was qualified or any open position reporting to Jeb Bassett. (*See* Spencer Affidavit at Exhibit 4.) Sowers admitted he had never worked in an office setting. Sower Deposition at p. 117, lines 4-6 at Exhibit 10. Sowers acknowledged in his deposition that only management worked in the main office. (*See* Sowers Deposition, p.117[1] at Exhibit 10.) According to Sowers, as to accommodation of his disability, the only time Bassett failed to accommodate him was about 6 weeks after his foot surgery, and Sowers himself acknowledged Bassett had no job that matched his restrictions and he was not even qualified for an office job. See Sowers Deposition, p. 47, lines 8-13 at Exhibit 10.

Mr. Sowers applied for and was granted long-term disability benefits from November 1, 2017, to January 26, 2018 (Complaint, ¶16) through a Bassett-sponsored disability plan, and was granted further FMLA leave (*See* personnel file at Exhibit 1), with the notation that Bassett would re-evaluate Sowers' work status near the end of that designated leave and consider an extension of such leave, a temporary part time to full time transition back to work contingent on a determination of whether any restrictions could be accommodated at that time. (*See* personnel file at Exhibit 1.)

Sowers was released to work up to four hours per day, then increase an hour each week as tolerated until he reached 8 hours per day for 5 days per week. Thereafter, Sowers returned to work at Bassett on January 29, 2018, where he did four-hour shifts for two days then was out sick for an unrelated reason until February 5, 2018. Sowers returned to his job on February 5, 2018

---

[1] Sowers stated, "We don't have any office settings until you are like the plant manager or something like that."

working 20 hours per week progressively until he could resume full time duties in March 2018. (Complaint, ¶17)

Around the end of June 2018, Sherman Moran instructed Sowers to report to an area and supervise two employees who were having a conflict. Plaintiff informed Moran that he was not going to babysit adults, despite the fact that one of the employees involved was part of the line that Sowers was tasked with supervising. (*See* EEOC record excerpt ("EEOC record"), Bates stamp 0229 at Exhibit 11). (Sowers Deposition, pp. 137 – 140 at Exhibit 10.)

On July 9, 2018, Plaintiff left a voicemail to Spencer to inform Bassett that he would not be present for work that day. According to Plaintiff, this was because he intended to instead attend his son's college orientation in South Carolina. Per Spencer, Sowers stated in a subsequent telephone conversation with her that he would be out that day and, if his son won a golf tournament, the next day as well. Sowers' absence that day made starting the Chair Box Line difficult. (*See* Spencer Affidavit at Exhibit 4.) According to Plaintiff, "this was when everything changed for me and issues began." (*See* EEOC record, Bates stamp 0268 at Exhibit 11). Mr. Sowers reiterated in sworn testimony that Bassett had been great to him up until the day he was demoted. (*See* Sowers Deposition, p. 77-78 at Exhibit 10.) However, Sowers also claims that his failure to attend a training seminar at the plant in the fall of 2017 also was a turning point in his job at Bassett. (See Sowers Deposition, p. 165 at Exhibit 10.)

On the following day, July 10, 2018, Plaintiff's then-supervisor, Mr. Sherman Moran, called Plaintiff to Human Resources to discuss his work performance, and Mr. Sowers was demoted from the position of Lead Person, with a corresponding reduction in his hourly wage. (Complaint, ¶31) According to Plaintiff, Moran cited Sowers' failure to remain in the area as

Moran had instructed him to supervise the two employees who were having a conflict, and stated that Moran complained of Sowers using words to the effect that Moran was tired of Sowers thinking he could do things his way, statements that Sowers characterizes as evincing Moran's discriminatory animus. (*See* Sowers Deposition, p. 99 at Exhibit 10.)

On that same day, Sowers complained about his demotion to Eddie White, Bassett's V.P. of Human Resources, alleging discriminatory and retaliatory demotion and pay decrease and alleging that he was being treated differently than other employees who had been demoted. (Complaint, ¶33) He then complained to John E. "Jeb" Bassett, III that he was being discriminated and retaliated against. (Complaint, ¶¶ 34, 37)

On July 20, 2018, Mr. Sowers allegedly informed Mr. Frick that he was attempting to get an emergency doctor's appointment with his physician regarding his throat because he was choking when he ate and asked Mr. Frick if he could find a substitute to perform the work for him. Plaintiff alleges that Mr. Frick stated they could not find a substitute and accused Mr. Sowers of scheduling a doctor's appointment to avoid having to perform his job. Plaintiff attended the appointment and provided Bassett a doctor's note on July 23, 2018. (Complaint ¶¶39-40)

On July 23, 2018, after continued poor performance, Mr. Sowers was placed on unpaid leave for one week for insubordination. Specifically, On July 19, 2018, Sowers had told his supervisor, Ellyson Frick, that he would not perform a task as instructed as he was not being paid to do that type of task. (*See* personnel file attached as Exhibit 1).

Attached hereto as Exhibit 9 is the Affidavit of Anita Zehnder ("Zehnder Affidavit"). Ms. Zehnder is a longtime employee of Bassett, and has supervised the "Table Line" (Sowers

supervised the "Chair Box Line") for the past 10 years. Ms. Zehnder describes in her Affidavit

yet another example of Sowers' refusal to perform certain jobs or tasks asked of him, as well as

Sowers' insistence that he be provided "preferential treatment". The Zehnder Affidavit

describes with specificity an incident when Sowers was asked to come to the "Table Line" and

learn the job duties performed by a fellow employee so that employee could take leave to care

for his dying father. Sowers refused to learn the job and refused to even listen to the job

description. Ms. Zehnder describes her "surprise" that a fellow employee would refuse to do

work asked of him, her surprise that Sowers threatened to go to Mr. Bassett ("Jeb") to seek

preferential treatment and further noted due to Sowers' refusal, the employees on the "Table

Line" had to make other arrangements so that Mr. Foster (the employee requesting leave) could

be granted the requested leave to care for his dying father. See Zehnder Affidavit at Exhibit 9.

Even prior to his demotion on July 10, 2018 Sowers had made applications for jobs at

other companies and he claimed to have had an interview with another employer in June 2018,

stating as his reason the need for more income to support his son, who was entering college, and

his daughter, who would soon also enter college. The EEOC records show Sowers was

interviewing for another job before his July 23, 2018 discipline when he was sent home for one

week without pay for insubordination. Further, Sowers has testified he was looking for another

job as early as June of 2018. (See Sowers Deposition pp. 13 – 14 attached at Exhibit 10). And

the EEOC record further reveals Sowers saying other employers were trying to hire him away

from Bassett well before he was demoted. (See EEOC record, Bates stamp 0230 at Exhibit 11).

In his deposition, Sowers admitted that the wage and benefits package at Hooker was "probably

a little better than at Bassett," and had more room for promotion. (See Sowers Deposition, p .75.

at Exhibit 10) Over the course of the prior three to four months, Sowers had informed

colleagues that he had another job offer for which he would leave Bassett as soon as wages were agreed upon, and that he would work a two-week notice once that happened. (*See* personnel file at Exhibit 1). When Plant 11 HR Director Jeannett Spencer asked why Sowers intended to leave Bassett, he informed her he would make more money. (*See* Spencer Affidavit at Exhibit 4.)

Upon his return on July 30, 2018, from the one week disciplinary suspension, Mr. Sowers was further counseled about his poor job performance, disruptive workplace behavior and issues with other employees. (*See* personnel file at Exhibit 1). Plaintiff alleges that, upon his return, he was called into a meeting with Ms. Spencer, Mr. Moran, and Mr. Frick and questioned about rumors that he "had been going around and asking other employees what their wages are." Plaintiff also alleges that Mr. Moran had been asking coworkers questions about Sowers's health and doctors' appointments, and that because of these alleged actions of Mr. Moran, which Plaintiff characterizes as "discrimination and retaliation," Plaintiff complained to Carter Underwood, Plant Manager. (Complaint, ¶¶42-45).

At one point, Sowers asked Underwood in passing if he could go to "BenchMade" (an operation which handles and distributes finished produce for Bassett.) Underwood knew there were no job openings at that facility and even if there had been, those jobs required more physical labor than Sowers performed at Plant 11. *See* Affidavit of Carter Underwood ("Underwood Affidavit") at Exhibit 6.

Shortly thereafter, Plaintiff sought and received on August 3, 2018, a "Certification of Health Care Provider for Serious Health Condition" (*See* personnel file at Exhibit 1). The notes of the Certification indicated "decompensated cirrhosis for which patient will need appointments for surveillance and treatment, medication, but patient is still able to do his job,

and will not be incapacitated due to condition." Around the time he sought and received this Certification, Plaintiff also filed a charge with the Equal Employment Opportunity Commission ("EEOC").

On October 12, 2018, Sowers voluntarily left his position at Bassett to accept other employment that he had apparently been discussing with other employees at Bassett for several months. (*See* excerpts from Sowers' personnel file from Hooker Furniture Corporation ("Hooker records") attached as Exhibit 2). Plaintiff's last day at Bassett was October 12, 2018 and his first day on the job with his new employer (Hooker) was October 15, 2018. Plaintiff nevertheless alleges he "was constructively terminated from employment." (Complaint, ¶47)

Mr. Sowers began his employment as a Fulfillment Coordinator at Hooker Furniture Corporation ("Hooker") on October 15, 2018. However, at Hooker, he repeated a pattern of initially receiving a positive review, only to be later terminated on the grounds of poor performance and behavior despite being counseled repeatedly about these aspects at work. (*See* Hooker records at Exhibit 2 and verified by Plaintiff during the course of his deposition.) Hooker terminated Sowers for cause, citing a "low level of productivity and employee tendency to be argumentative and disagreeable" on August 22, 2018, roughly ten months after he began. (*See* Hooker records attached hereto as Exhibit 2.)

During the course of Mr. Sowers' deposition he testified, under oath, as to his "theory" concerning the reasons which prompted his termination at Hooker Furniture. His "theory" (or perhaps "conspiracy theory" would better describe Sowers' testimony) is as follows:

Sowers was "done wrong" by Hooker (although he hasn't sued Hooker "yet") because "Bassett and Hooker" are "family" . . . "the Bassetts and the Hookers are related". Mr. Sowers

says he came up with this "connection" on his own, and Bassett and Hooker worked together to terminate Sowers "Because they are family". Ultimately Sowers drew the "conclusion" that Hooker fired him because Bassett wanted him fired. (*See* <u>Sowers Deposition</u>, pp. 85 – 89, at Exhibit 10).

The Plaintiff's "theory" or "conclusion" relative to his firing at Hooker, it is respectfully submitted, defies credibility.

Additionally, various excerpts from Mr. Sowers' deposition serve to illustrate the problems Bassett dealt with concerning Sowers' job performance and his attitude over time. Sowers alleges that he was mistreated, and the victim of retaliation and/or discrimination because of his exercise of his right to take FMLA leave. However, despite being asked point blank in his deposition . . . "Did anybody say that they disliked the fact that you were asking for FMLA time" . . . Sowers' answer was, ultimately "No". See <u>Sowers Deposition</u>, pp. 134 – 135 at Exhibit 10.

Further, Sowers claims Bassett should have offered him light duty following his foot surgery when he had restrictions so stringent Bassett had no job to offer him. Even though Sowers pointed to a job he described as "parts assembly", in his deposition he testified he did not know what a "parts assembly" job was and that putting screws in a bag was not really a job. See <u>Sowers Deposition</u>, pp. 50 - 54, 55 - 57 and p. 121 at Exhibit 10.

Lastly, it is of significant factual importance to note that Mr. Sowers claims his being "punished" by Bassett "all started" when he did not come into the plant to attend a training seminar shortly after his foot surgery. Sowers testified "I think that is when it all started with

them treating me the way they was treating me. I think it started that day." See <u>Sowers Deposition</u>, pp. 165 – 166 at Exhibit 10.

The theory, too, lacks credibility. At the same time that Sowers testifies Bassett's discrimination and retaliation against him started because he wouldn't attend a seminar, he readily admits his supervisors began to counsel him about his poor job performance, and his supervision of the <u>entire</u> Chair Box Line well in advance of his foot surgery and attendant time out of work in late 2017. *See* <u>Sowers Deposition</u>, pp. 164 – 166 at Exhibit 10.

Time and again Mr. Sowers skirted the responsibilities of a lead person in supervision, calling such a position nothing more than being "a babysitter" and, once demoted with a corresponding pay cut, refusing to undertake simple steps to keep the Chair Box Line running smoothly by responding, in essence, "not my job". See <u>Sowers Deposition</u>, pp. 33, 137, 138, 139, 140 and 93 – 97 at Exhibit 10.

## III. <u>Standard of Review</u>

Summary judgment is appropriate when a court, viewing the record as a whole in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law. *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986); *see also* F. R. Civ. P. 56. If the moving party produces evidence suggesting that there is not a genuine and material dispute, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts", as the existence of a scintilla of evidence is insufficient to defeat a motion for summary judgment. *See* <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, et al., 475 U.S. 574, 586 (1986); <u>Catawba Indian Tribe of S.C. v. South Carolina</u>, 978 F.2d 1334, 1339 (4th Cir. 1992). While the

nonmoving party is entitled to have the facts viewed in the light most favorable to its cause, a motion for summary judgment "requires the nonmoving party to go beyond the pleadings...and designate specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324 (internal quotation marks omitted). The nonmoving party must demonstrate specific facts, as opposed to general allegations, that present an issue worthy of trial. See Lujan Defenders of Wildlife, 504 U.S. 555, 566-67 & note 3 (1992).

In so designating specific facts and issues to be determined at trial, the nonmoving party must indicate facts that are material and issues that are genuine. See Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Guinness PLC v. Ward, 955 F.2d 875, 882 (4th Cir. 1992). Disputed facts are "material" only if they are necessary to resolving the case, and issues are "genuine" only if based on more than speculation or inference. Thompson Everett, Inc. v. National Cable Advertising, L.P., 57 F.3d 1317, 1323 (4th Cir. 1995); See Hux v. City of Newport News, Va., 451 F.3d 311, 315 (4th Cir. 2006) ("[T]he genuineness and materiality requirements express the sound proposition that litigation for its own sake is not a judicious use of resources.").

In deciding whether there is a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in his favor. See Anderson, 477 U.S. at 255. Where the record indicates that no rational trier of fact could find for the nonmoving party, summary judgment is appropriate. See Matsushita, 475 U.S. at 587. Where the nonmoving party bears the burden of proof at trial, the moving party need only point to the absence of evidence to support an essential element of the nonmoving party's case; the moving party does not have to support its motion with evidence negating the nonmoving party's case. See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Conn., 108 F. Supp. 2d 549 (W.D. Va. 2000).

IV.   **Argument and Authorities.**

A.   **Plaintiff's FMLA interference claim fails because (1) Plaintiff failed to show he was an eligible employee under the FMLA; (2) Plaintiff failed to show he provided sufficient notice to Bassett of his alleged serious health condition or request for FMLA leave; and (3) Plaintiff has produced no evidence that Bassett interfered with any right to FMLA benefits or that he suffered any harm resulting from any alleged interference.**

1.   **Plaintiff failed to show he was an eligible employee under the FMLA.** To make out an "interference" claim under the FMLA, an employee must thus demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm. *See* Adams v. Anne Arundel Cnty. Pub. Sch., 789 F.3d 422, 427 (4th Cir. 2015), *citing* Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002); Wonasue v. Univ. of Md. Alumni Ass'n, 984 F. Supp. 2d 480, 495 (D. Md. 2013). Plaintiff has the burden to show that he is an eligible employee under the FMLA. Adams v. Anne Arundel Cnty. Pub. Sch., 789 F.3d 427.

Plaintiff fails to allege specific facts showing that there is a genuine issue for trial on whether he was an eligible employee under the FMLA. To establish a *prima facie* case a Plaintiff must prove, among other things, that he was an "eligible employee" and was therefore entitled to the protections of the statute. 29 U.S.C.S. § 2612(a). To qualify as an "eligible employee," an employee must have worked at least 1,250 hours with his employer during the twelve-month period prior to the period of leave commencement. 29 U.S.C.S. § 2611(2)(A)(ii). *See* Moticka v. Weck Closure Systems, 183 F. App'x 343, 349 (4th Cir. 2006) (finding that at

the time that plaintiff was terminated she had not worked the 1,250 hours required and thus was not eligible for FMLA leave, and thus holding that plaintiff "failed to show any entitlement to coverage under the FMLA, let alone a violation of the FMLA"). Only hours actually worked qualify for credit toward this total. 29 U.S.C.S. § 2611(2)(C); 29 U.S.C.S. § 207(e)(2). *See also* Rockwell v. Mack Trucks, 8 F. Supp. 2d 499, 502 (D.Md. 1998). Hours worked during the preceding 12-month period are computed from the date of the commencement of the leave. Further, "the guidelines for calculating the number of 'hours worked' under the FLSA clearly state that only hours actually spent working count toward the FMLA 'hours of service' requirement." Id. quoting Aldrich v. Greg, 200 F. Supp. 2d. *See also* Wemmit-Pauk v. Beech Mountain Club, 140 F. Supp. 2d 571, 581 (granting summary judgment to an employer on a FMLA claim because the plaintiff was not an eligible FMLA employee and thus never engaged in "protected activity" under the FMLA).

Plaintiff has failed to meet his burden of demonstrating that he was an eligible employee who worked the requisite number of hours to be eligible for FMLA leave. According to his employment records, Sowers only worked 842.22 hours and 1,130 hours during the twelve-month period respectively before his demotion on July 9, 2018, and his separation from employment at Bassett on October 12, 2018. *See* Affidavit of Edward H. White ("White Affidavit") at Exhibit 7.

Ultimately, Plaintiff provides no competent evidence quantifying the number of hours establishing his eligibility, and "it is well settled that speculation and unsupported allegations are insufficient to establish a dispute of material fact." *See* Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995) Thus, in accordance with the Fourth Circuit's holding in Moticka, Plaintiff cannot demonstrate he had a right to FMLA leave, and

consequently also fails to state a claim that Bassett interfered with any such right. The only "fact" that is undisputed with regard to Plaintiff's FMLA leave is that it was granted to Plaintiff and that Bassett at no time denied him such leave. *See* White Affidavit at Exhibit 7.

Moreover, while the FMLA affords an eligible employee leave when the employee suffers from "a serious health condition that makes the employee **unable to perform the functions** of . . . [his] position." 29 U.S.C. § 2612(a)(1)(D) (emphases added), Plaintiff fails to establish that he suffered from any such condition at all. After returning from FMLA and then short-term disability leave, Plaintiff returned to work at light duty with certain restrictions, then was cleared for and later resumed work at "full duty, with no restrictions" up until the complained-of employment actions. If he was unable to work, following his full release, that was a circumstance lost on Sowers, his colleagues and his supervisor at Bassett.

In the alternative, should Plaintiff allege that the qualifying FMLA leave was that which was approved by Bassett, pursuant to which he took a leave to have and recuperate from surgery, this argument would be unavailing. While an employee who requests several distinct periods of absence for "a single qualifying reason" is seeking only one period of intermittent leave (*See, e.g.*, Barron v. Runyon, 11 F. Supp. 2d 676 (E.D.Va July 7, 1998)), in this case, Sowers has not alleged periods of absence for a "single qualifying reason." Plaintiff claims that he requested leave to attend – and did attend – a medical appointment for his throat condition on July 20, 2018, a date on which he was not FMLA eligible due to insufficient hours, as any issues with his throat are unrelated to the FMLA eligible leave he had taken earlier for his foot surgery. His allegation concerning his esophageal varices is entirely separate from the serious health condition of which he had notified Bassett and taken leave between August 2017 and January 2018. As such, any claim based on Plaintiff's requested leave for this condition on or

around July 20, 2018 is one for which Plaintiff had no entitlement to FMLA leave, and should not be considered. Clearly, if Plaintiff had not worked the requisite hours for FMLA eligibility on July 10, 2018, he would not have the requisite hours on July 20, 2018.

**2.** **Plaintiff failed to provide sufficient notice of a serious health condition or a request for FMLA leave.** Plaintiff fails to allege specific facts showing that there is a genuine issue for trial on whether he provided sufficient notice to Bassett that he had a serious health condition or requested FMLA leave for such alleged serious health condition.

While an eligible employee need not expressly mention the FMLA as a source of his right to request leave, he must explicitly inform his or her employer that the request to take time off is related to a serious health condition or one of the other reasons covered by the FMLA. *See* Manuel v. Westlake Polymers Corp., 66 F.3d 758, 764 (5th Cir. 1995) (The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.) Merely telling an employer that you are "sick" is not sufficient. Collins v. NTN-Bower Corp., 272 F.3d 1006, 1008 (7th Cir. 2001). *See also* Walton v. Ford Motor Co., 424 F.3d 481, 486 (6th Cir. 2005) (employee's statements that he was "sick" and had scheduled a doctor's appointment not sufficient notice); Phillips v. Quebecor World RAI, Inc., 450 F.3d 308, 311-12 (7th Cir. 2006) (employee's statement that she was "sick" and had been seen at health center not sufficient notice); Satterfield v. Wal-Mart Stores, Inc., 135 F.3d 973, 980 (5th Cir. 1998) (employee's mother's statements that employee "was sick," "was having a lot of pain in her side," and would not be able to work not sufficient notice); *cf.* Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir. 2003) (holding that notice was sufficient where employee informed employer that he had been in motorcycle accident which required hospitalization and that he would be unable to

perform his job). The fact of previous treatment, including surgery, is also not sufficient notice

of an ongoing serious health issue warranting FMLA leave. *See* Gipson v. Vought Aircraft

Indus., Inc., 387 Fed. App'x 548 (6th Cir. 2010) (the fact that the employee had previously

undergone heart surgery did not place the employer on notice of ongoing heart problems).

  The record reveals that Plaintiff has failed to present evidence that he complied with the

FMLA requirement to provide sufficient notice to Bassett that he had a significant health

condition for which he was requesting leave for which he was eligible. At no point has Mr.

Sowers alleged that he informed Bassett at the relevant times (that is, after his return to work)

that he suffered from a serious health condition as defined under the FMLA. Indeed, while

Plaintiff alleges that he "is Diabetic and suffers from Esophageal varices," the record reveals,

*assuming arguendo*, that this qualified as a "serious health condition," Plaintiff's sole

notification to Bassett of his varices occurred after he was demoted for poor performance.

Notably, this was the only condition for which Plaintiff alleges in his complaint that he

requested leave after returning to work, and this at a time during which he was no longer FMLA

eligible based on his hours. The record also reveals that Mr. Sowers only sought, received and

notified Bassett of the classification of having another serious health condition – liver cirrhosis

– in August 2018, after being reprimanded for poor performance and suspended for

insubordination, around the same time Sowers also began a complaint with the EEOC.

  **3.**  **Plaintiff has produced no evidence that Bassett interfered with any right to**
**FMLA benefits or that he suffered any harm resulting from any alleged interference.** Even

if Plaintiff were able to establish eligibility under the FMLA, his FMLA interference claim must

fail because he fails to allege specific facts creating a genuine issue of material fact that Bassett

interfered with the provision of any benefit under FMLA or that any alleged interference caused

him any harm. The record is devoid of any evidenced claim that Sowers was unable to enjoy any benefit entitled under the FMLA in the form of missed appointments or other outcome.

With respect to his qualifying FMLA leave that commenced August 2017, Sowers enjoyed the full 12 weeks statutorily guaranteed him, as well as additional, paid long term disability leave thereafter. Bassett facilitated his obtaining these benefits. Were Plaintiff to argue that Bassett interfered with his FMLA benefit by inviting him to attend a training seminar while he was out on FMLA, such argument would fail scrutiny. Plaintiff did not in fact attend the seminar. However, the record shows that he enjoyed his full FMLA leave, additional long-term leave through a Bassett-sponsored disability program, and an unprecedented level of accommodation upon his return to work. (*See* Affidavits of Claude E. Frick ("Frick Affidavit"), Moran and Spencer at Exhibits 5, 3 and 4).[6] Although Sowers cannot dispute that he enjoyed the benefit of his full FMLA leave and disability benefits following his foot surgery, at his deposition he testified that Bassett "punished" him for failing to attend the seminar with absolutely no evidence offered to back up that assertion.

To the extent Sowers alleges that Bassett interfered with his alleged appointment for his throat issues, this claim fails as the requested leave on July 20, 2018, was at a time Sowers was not FMLA-eligible due to insufficient hours. Even if this leave had been FMLA qualifying, the record reflects that Sowers was able to attend his appointment that very day. Moreover, after the incident concerning the July 20, 2018, appointment, Sowers continued in his position until he voluntarily left Bassett to go to work for Hooker Furniture Corporation in October 2018.

---

[6] Claude "Ellyson" Frick, supervisor and a friend of Sowers who has known him since their high school days, stated that Bassett "bent over backwards" to help Mr. Sowers and to let him work light or restricted work consistent with his doctor's orders. "In my 31 years of employment at Bassett I do not remember any other Bassett employee who was provided such restrictive work for that length of time." This view is echoed by Moran and Spencer.

The Supreme Court has observed that the "purpose of [an interference claim] is to permit a court to inquire into whether the employee would have exercised his or her FMLA rights in the absence of the employer's actions." Ragsdale, 535 U.S. at 91. Sowers' proffers fail to suffice to create an issue of triable fact as to any FMLA leave for which he was qualified but for which he failed to exercise his rights. In the absence of evidence showing any harm to Plaintiff's exercise of his rights under the FMLA, Plaintiff's claim for FMLA interference fails as a matter of law.

**B.** **Plaintiff's FMLA discrimination and retaliation claims fail because (1) Plaintiff was not an eligible employee under the FMLA and did not engage in a protected activity, (2) Plaintiff failed to show a causal link between Plaintiff's engaging in a protected activity and adverse employment actions, and (3) Bassett's employment actions were for legitimate, non-discriminatory reasons.**

Discrimination and Retaliation claims brought under the FMLA are analogous to those brought under Title VII. See Laing v. Federal Express Corp., 703 F.3d 713, 717 (4th Cir. 2013); Yashenko, 446 F.3d at 550-51. Plaintiff must prove three elements to establish a *prima facie* case of retaliation: (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events. See Boyer-Liberto v. Fontainebleau Corp., No. 13-1473, 786 F.3d 264, 2015 U.S. App. LEXIS 7557, *38 (4th Cir. 2015) (en banc). If the defendant advances a lawful explanation for the alleged retaliatory action, the plaintiff must demonstrate that the defendant's reason for taking the adverse employment action was pretextual. *See* Laing, 703 F.3d at 717, 719 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))

    **1.** __Plaintiff was not an eligible employee under the FMLA and thus did not__
__engage in a protected activity.__ Plaintiff fails to allege specific facts showing that there is a
genuine issue for trial on whether he engaged in protected activity. The first *prima facie* element
of a FMLA retaliation claim – protected activity – requires that a plaintiff demonstrate that he is
an eligible employee. Jacobs v. UPS, Inc. 2016 U.S. Dist. LEXIS 167512 (W.D. Na. Dec. 5,
2016) at *4. As established above, Sowers has failed to demonstrate that he was an eligible
employee under the FMLA. (See supra Section IV.A.1) As he was ineligible for FMLA
coverage at the relevant time, Plaintiff did not engage in FMLA protected activity, and his claim
for discrimination and retaliation under the FMLA must fail as a matter of law.

    **2.** __Plaintiff failed to show a causal connection between any adverse employment__
__action and engaging in a protected activity.__ Plaintiff fails to allege specific facts showing that
there is a genuine issue for trial on whether his alleged engagement in protected activity was
causally related to Bassett's decision to demote him or take disciplinary action against him.
Plaintiff asserts that, "the temporal proximity between the time Mr. Sowers requested leave and
accommodations related to his disabilities/serious health conditions and his constructive
termination. . . supports Mr. Sowers' claims for discrimination and retaliation." (Complaint, ¶51).
Putting aside Mr. Sowers's voluntary departure from Bassett under conditions that fall far short
of the required objective intolerability standard, Mr. Sowers's assertion of a temporal proximity
between his use of the benefits of the FMLA statute and his leaving Bassett's employ does not
survive scrutiny. Plaintiff's personnel file reveals that he had been granted FMLA leave on
numerous occasions, including January 2014, February, June and July 2014, January, February,
March, April, September, October and November 2015. *See* personnel file attached as Exhibit 1.

Moreover, the Fourth Circuit has rejected mere "temporal proximity" as sufficient to evince the required causality under the FMLA statutes. Except for situations in which the adverse employment decision follows the protected activity "very close[ly]," "mere temporal proximity" between the two events is insufficient to satisfy the causation element of the *prima facie* requirement. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotations omitted), accord Hinton v. Va. Union Univ., 185 F. Supp. 3d 807, 837 (E.D. Va. May 4, 2016).

Yet, even if it were possible to salvage an otherwise unevidenced allegation of causality based upon mere temporal proximity, the facts in Mr. Sowers' case are still unavailing. Beyond the fact that Plaintiff had taken leave on numerous occasions over the years without incident, Plaintiff may not rely on his having taken leave between late 2017 and early 2018 to establish retaliation in the form of a demotion in July 2018 (or alleged constructive discharge in October 2018). The Fourth Circuit has found that a three- or four-month lapse between the protected activities and discharge would be "too long to establish a causal connection by temporal proximity alone," and even a mere ten-week separation "is sufficiently long so as to weaken significantly the inference of causation between the two events." Hinton, 185 F. Supp. 3d. at 837-838, *citing* Pascual v. Lowe's Home Ctrs., Inc., 193 Fed. Appx. 229, 233 (4th Cir. 2006) (unpublished) and King v. Rumsfeld, 328 F.3d 145, 151 n. 5 (4th Cir. 2003). Plaintiff thus fails to establish any temporal proximity that, together with other indicia, could have lent credence to his claims of retaliation.

The facts pleaded also fail to show that Plaintiff's use of FMLA leave, rather than his repeated, unremediated failures on the job, were the cause of Bassett's decision to demote him. As recited in the attached Affidavits of Sherman Moran, Jeannett Spencer, Claude E. Frick, and

J. Carter Underwood, there was a legitimate non-discriminatory, non-retaliatory reason for demoting Sowers from a supervisory position at Bassett. Each Affidavit sets forth matter of factly portions of the following factual background leading up to Sowers' demotion in July of 2018:

Sherman Moran talked to Sowers on numerous occasions about his poor performance as lead person. Sowers failed to assure the contents of boxes (Furniture components) were correct for each particular shipment. Moran was aware of customer complaints which resulted from Sowers' poor job performance and brought those problems to Sowers attention <u>before</u> Sowers went out of work for foot surgery in 2017.   Moran further states in his Affidavit that he and Ellyson Frick (as Sowers' supervisors) and Jeannett Spencer (HR Director at the plant where Sowers worked) counseled Sowers at least 3 or 4 times regarding his job performance. Moran also states that Sowers told him he did not want a job in supervision, in part, because he did not want to "babysit" other employees. [7]  *See* <u>Moran Affidavit</u> attached as Exhibit 3.

Jeannett Spencer (HR Director at Plant 11) describes in her Affidavit Bassett's ongoing efforts to accommodate Mr. Sowers work restrictions following his foot surgery in 2017.  She further states that at the time of Plaintiff's request, Bassett had no suitable vacant positions available that could accommodate Sowers' relatively severe restrictions posed by Sowers' treating physician following that surgery.[8]

Ms. Spencer further describes Sowers' poor performance on the Chair Box line, noting as early as 2014 employees on the line often complained about Sowers' tendency to stay at one

---

[7] A fact Mr. Sowers acknowledges in his deposition at page 140.

[8] The record in fact reveals that Bassett actually allowed Sowers to work progressively towards a return to full duty following that surgery, allowing him to work a mere 20 hours a week from February 5, 2018 until his return to full duty status in March, 2018.

location on the line rather than assisting and supervising all the line employees. Ms. Spencer also recounts her involvement in several counseling sessions with Sowers, Moran and Frick in which Sowers was advised about his poor performance and advised that should performance not improve he would be demoted.

Ms. Spencer further verifies that Sowers was demoted due to poor performance which was well documented and not because he exercised his rights to take FMLA or any other leave, or in retaliation for taking such leave. *See* Spencer Affidavit attached as Exhibit 4.

Claude E. "Ellyson" Frick (Sowers' immediate supervisor) describes the manufacturing done at Bassett's Plant 11 and describes the work performed on the "Chair Box Line". Mr. Frick details the responsibilities of the lead person (Sowers) on that line: the lead person must supervise the entire line and insure that each box is properly packaged with the appropriate product and all the necessary components and that the box is labeled properly for shipment. Mr. Frick further details the history of Sowers' ongoing poor performance (or failures) in carrying out those necessary and important job responsibilities.

Throughout the time that Frick supervised Sowers (from February, 2014 to July 2018) the Affidavit details the instances when he, Moran and Spencer counseled Sowers about his poor performance. *See* Frick Affidavit attached hereto as Exhibit 5.

Additionally, J. Carter Underwood (who headed supervision of Plant 11) further recounts the instances he observed of poor job performance by Sowers. On at least 3 occasions Underwood observed the problems created by Sowers' job performance and asked Moran to counsel Sowers in an effort to make him aware of needed improvement. *See* Underwood Affidavit attached as Exhibit 6.

Thus, were Plaintiff to argue that Bassett retaliated against him for availing himself of his FMLA benefit, this claim would fail scrutiny. The record shows that Mr. Sowers enjoyed his full FMLA leave (as he had on numerous occasions before) additional long-term leave through a Bassett-sponsored disability program, and an unprecedented level of accommodation upon his return to work, then continued in his role for nine months until his demotion for work issues for which he himself admits he had been counseled repeatedly. A causal relation between the use of FMLA and his demotion here is not merely tenuous; it is absent.

Plaintiff's retaliation claim thus fails as a matter of law. An employee may not insulate himself from a pending action by opportunistically invoking FMLA. *See* Moorer v. Baptist Memorial Health Care, 398 F.3d 469, 488-489 (6th Cir. 2005). Where an employer claims an employment action would have occurred regardless of the employee's request for FMLA leave, the employee must convince the trier of fact otherwise. Id. Plaintiff's pleaded facts as a matter of law thus fail to show that there is a genuine issue for trial on whether Plaintiff was demoted for seeking to benefit from FMLA leave.

### 3. Even if Plaintiff had established a *prima facie* case, the evidence establishes that Bassett's demotion and discipline of Sowers were for legitimate, non-discriminatory reasons. Plaintiff has not met his burden of showing *prima facie* discrimination under the McDonnell Douglas framework. Yet, even if he had, summary judgment would still be appropriate because the record is clear that Mr. Sowers's failed to meet the reasonable and legitimate expectations of his employer due to costly, repeated failures on the job in the position of Lead Person. Both prior to and subsequent to taking leave for foot surgery, Sowers was counseled on several occasions before being demoted, yet failed to improve his performance. Moreover, beyond his costly errors that impaired productivity and jeopardized the Company's relationships with its

customers, the Plaintiff was insubordinate. Any of these indisputable failures would have been cause for demotion, and Plaintiff cannot plausibly allege that his exercise of rights, even if he had any entitlement to such rights, was the cause of his demotion or discipline. *See supra* Section IV.B.2 and *Affidavits* attached hereto as Exhibits 3 through 8.

### C. Plaintiff's ADA Discrimination and Retaliation Claims fail because (1) Plaintiff was not disabled and did not engage in "protected activity," (2) Plaintiff was not discharged, (3) Plaintiff was demoted and disciplined because his performance and conduct on the job failed to meet Bassett's legitimate expectations, and (4) Plaintiff fails to establish the requisite causation between his discipline and any real or perceived disability.

The ADA provides that it is unlawful to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the Fourth Circuit, a plaintiff's discrimination claims under the ADA must be proven using the "but-for" standard. *See* <u>Gentry v. East West Partners Management Co., Inc.</u>, et al., No. 14-2382, 2016 U.S. App. LEXIS 4128 (4th Cir. 2016). Where an employer denies that an adverse employment action was based on an employee's alleged disability, the court must use a burden-shifting method of proof like that set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See* <u>Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.</u>, 53 F.3d 55, 58 (4th Cir. 1995), *accord* <u>Miller v. Pilgrim's Pride Corp.</u>, 2007 U.S. Dist. LEXIS 48971, W.D. Va., 14-15 (July 6, 2007). Therefore, in a discriminatory discharge claim under the ADA, to survive summary judgment the plaintiff must therefore show that: (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met

his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See* Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 2001 U.S. App. LEXIS 10699, *14, 2001 WL 558152, at *5 (4th Cir. 2001).

Once an employee has made this *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the *prima facie* case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that he has been the victim of intentional discrimination. St. Mary's Honor Ctr. v. Hicks, 125 L. Ed. 2d 407, 113 S. Ct. 2742, 2746-49 (1993) (holding that *prima facie* case plus disbelief of employer's asserted justification for employment action is not necessarily sufficient to establish violation; summary judgment is appropriate unless plaintiff presents adequate evidence that the employer unlawfully discriminated).

Similarly, with respect to retaliation claims under the ADA, under the burden-shifting method of proof a plaintiff must, in order to survive summary judgement, show that: (1) he engaged in a protected activity; (2) the employer acted adversely against him; and (3) his protected activity was causally connected to his employer's adverse action. The employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions. If the employer does so, the plaintiff must demonstrate that the proffered reason is a pretext for forbidden retaliation. The plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation. See, e.g., Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.11 (4th Cir. 2001).

As is clearly set forth in the Affidavit of John E. "Jeb" Bassett, III, there was a

legitimate non-retaliatory, non-discriminatory reason for Bassett's actions in demoting Plaintiff from a supervisory position.

In his Affidavit, Mr. Bassett detailed his longstanding familiarity, on a personal basis, with Sowers. But of significant note in this Affidavit is the factual explanation of how Sowers' poor job performance negatively impacted Bassett from a financial standpoint, as well as from a loss of reputation/customer satisfaction standpoint.

As Mr. Bassett states, production at Plant 11 is closely followed, as is customer feedback regarding any furniture purchase which is made and boxed in Plant 11. Mr. Bassett was personally aware of incorrect shipments which did not contain the product for which the box was labeled. **Those mistakes were discussed with management at Plant 11.** (Emphasis added) Bassett received a report each Sunday morning reviewing customer complaints from the previous week. On Tuesday mornings management personnel and customer service managers would meet concerning any problems encountered. The plant manager (Mr. Underwood at the time Sowers worked as lead person on the line) would take the customer service complaints back to Plant 11 to address concerns.

Mr. Bassett matter of factly states that it was Sowers' job to ensure that items boxed and shipped from the Chair Box Line at Plant 11 to a customer were done correctly and contained the product ordered by that particular customer. The failure of the Chair Box line to ship correct product cost Bassett Furniture Industries time, money and a loss of reputation. Mr. Bassett unequivocally states that if the Chair Box Line had been properly supervised (i.e. the role Sowers played) then such mistakes would have been reduced to a minimum. *See* Affidavit of John E. "Jeb" Bassett, III ("Bassett Affidavit") attached hereto as Exhibit 8.

## 1. **Plaintiff was not an individual with a disability at the time of his alleged**

**constructive discharge, demotion or discipline.** Plaintiff's personnel records establish that he was not – nor was he regarded as – an individual with a disability that substantially limited his working at the time of his demotion or discipline or of his alleged constructive discharge. The facts establish that Plaintiff had a disability for which he was on FMLA leave and then Bassett-sponsored long-term disability leave until he returned to work in January of 2018. The record also reflects that Plaintiff was disabled and was accommodated with light duty (limited hours each day) upon his return, and gradually worked up to full duty in March 2018. At no point subsequent does the record reflect that the Plaintiff was disabled at the time he was demoted for subpar performance or disciplined for insubordination in July or at the time he voluntarily departed Bassett for Hooker in October of 2018. *See* Hooker records attached hereto as Exhibit 2, wherein Plaintiff applied for the position of "Fulfillment Coordinator", indicated no physical disability and acknowledged he could lift 50 lbs., and then began his job at Hooker on October 15, 2018, just 3 days after leaving Bassett.

While the ADA statute also defines a disability to include the condition of "being regarded" as having a physical impairment that "substantially limits the major life activity of working," Plaintiff fails to allege specific facts to satisfy this lower burden as well. At best, Plaintiff alleges in his complaint that then-supervisor Moran speculated about whether Plaintiff would be able to do his job after his surgery, speculation which, if true, seems to have been borne out by Plaintiff's disability leave and Bassett's accommodation of his light duty until March 2018. Yet, Plaintiff, who stated that his problems all began after his July 9, 2018, absence from work, fails to allege that this prior disability was in any way related to any action on Bassett's part. His July 9, 2018, absence from work was not at all related to any health issue, but rather to his choice to be absent with very short notice.

Plaintiff is required to go beyond the pleadings…and designate specific facts showing that

there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. As Plaintiff fails to allege

specific facts showing that there is a genuine issue for trial on whether he was an individual with a

disability – or regarded as such by Bassett – at the time he was demoted, disciplined or allegedly

"constructively discharged," Plaintiff's ADA discrimination and retaliation claims fail as a matter

of law.

   **2. Plaintiff was not discharged – constructively or otherwise – by Bassett.** The

United States Supreme Court set a new standard for constructive discharge in Green v. Brennan,

136 S. Ct. 1769 (2016) (*Accord* United States EEOC v. Consol Energy, Inc., 860 F.3d 131 (4th

Cir. 2017). The Supreme Court's clearly articulated standard for constructive discharge requires

objective "intolerability" — "circumstances of discrimination so intolerable that a reasonable

person would resign," Green 136 S. Ct. at 1779, *quoting* Pennsylvania State Police v. Suders,

542 U.S. 129, 141-143 (2004). The Fourth Circuit has found that "dissatisfaction with work

assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions

are not so intolerable as to compel a reasonable person to resign." Stennis v. Bowie State Univ.,

716 F. App'x 164, 167 (4th Cir. 2017), *quoting* Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d

180, 187 (4th Cir. 2004). Sowers has admitted in his deposition that he in fact had submitted

applications to other employers in June of 2018, well before his July demotion or his quitting

without notice in October, 2018. See Sowers Deposition, p. 13 at Exhibit 10.

   Plaintiff fails to allege specific facts showing that there is a genuine issue for trial on

whether he was constructively terminated. The only facts alleged in support of the constructive

termination claim were that Plaintiff was allegedly accused of work avoidance, Plaintiff was

questioned about reports that he had been asking his coworkers about their pay, Plaintiff's

supervisor asked his coworkers about Plaintiff's doctor's appointments, and, despite Plaintiff's complaint about his demotion, he was not restored to his prior position and pay (Complaint, ¶¶ 39, 42, 43 and 45). Plaintiff has utterly failed to present facts evidencing the required objective "intolerability" — "circumstances of discrimination so intolerable that a reasonable person would resign," Green v. Brennan, 136 S. Ct. at 1779.  As the United States Supreme Court and the Fourth Circuit have articulated in Green v. Brennan, Consol Energy, and Stennis, among others, such dissatisfaction with work assignments, feeling unfairly criticized, or even difficult or unpleasant working conditions do not meet the Fourth Circuit's requirement of objective intolerability. Plaintiff's pleaded facts as a matter of law fail to show that there is a genuine issue for trial on whether Plaintiff was constructively discharged. Therefore, all of Plaintiff's claims that are predicated on such alleged discharge should be dismissed.

**3. Plaintiff was demoted and disciplined because his performance and conduct on the job failed to meet Bassett's legitimate expectations.** Even if Plaintiff were able to present facts showing that there is a genuine issue for trial as to his status as disabled, Plaintiff's claim would fail because his work performance and conduct on the job failed to meet Bassett's legitimate expectations. The record is clear that Mr. Sowers failed to meet the reasonable and legitimate expectations of his employer due to costly, repeated failures on the job in the position of Lead Person. *See* Affidavits of Moran, Spencer, Frick, Underwood and Bassett, attached as Exhibits 3, 4, 5, 6 and 8.  The Plaintiff was counseled on several occasions before being demoted, yet failed to improve his performance. Moreover, beyond his costly errors that impaired productivity and jeopardized the Company's relationships with its clients, the Plaintiff was insubordinate, a violation punishable by termination without warning, as Mr. Sowers was aware. *See* Handbook excerpt on "General Conduct" at Exhibit 12.  Any of these indisputable failures

would have been just cause for demotion, and Plaintiff cannot plausibly claim that his alleged disability was the cause of his demotion or discipline.[10]

**D. Plaintiff's ADA Failure to Accommodate Claim Fails because Plaintiff fails to show (1) he was an individual with a disability at the time of his demotion or discipline; (2) he provided sufficient notice of his alleged disability; and (3) Bassett denied him reasonable accommodation.**

The ADA provides that it is unlawful to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to … terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). ADA discrimination includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." US Airways, Inc. v. Barnett, 535 U.S. 391, 396 (2002); § 12112(b)(5)(A). To establish a *prima facie* case on a failure-to-accommodate claim, Plaintiff must show that (1) he qualifies as an "individual with a disability" as defined in 29 U.S.C.A. § 705(20); (2) Bassett had notice of his disability; (3) he could perform the essential functions of the job with a reasonable accommodation; and (4) Bassett refused to make any reasonable accommodation. *See* Reyazuddin v. Montgomery Cnty. 789 F.3d 407 (4th Cir. 2015), *citing* 29 U.S.C.A. § 794(a); Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). Where a condition qualifies as a physical impairment, a claimant must show that it substantially limits the major life activity of

---

[10] Plaintiff alleges a Bassett policy requiring that an employee be written up three times before a termination, yet fails to cite the source of this claim. Bassett has no such policy in its handbook, and Plaintiff has cited no evidence for it.

working **at the time of his termination** to recover under the ADA, 42 U.S.C.S. §§ 12101-12213 (1994 & 1998). (emphasis added).

  **1.  Plaintiff was not an individual with a disability at the time of his alleged constructive discharge, demotion or discipline.** As set forth in Section IV.C.1 plaintiff fails to allege specific facts showing that there is a genuine issue for trial on whether he was an individual with a disability at all relevant times.  In fact, at the times of his claimed "constructive termination" on October 12, he clearly was not disabled nor considered himself to have a serious health condition as he accepted and began a job at Hooker, for which he had earlier applied, and indicated no disability.  It is illustrative to note that Sowers left Bassett on October 12, 2018 and began work at Hooker on October 15, 2018, the very next weekday.

  **2.  If Plaintiff was disabled, he failed to provide sufficient notice of such disability to Bassett**. While the record is clear that Plaintiff had notified Bassett about a disability for which he had foot surgery and took a leave from work for a period of time, the record is bereft of any notice from Plaintiff concerning any such disability that occurred after his recovery from the foot surgery and resumption of unrestricted duty in March, 2018, and Plaintiff specifically alleges no notification to Bassett of any disability at the times Bassett demoted or disciplined him.

  **3.  Bassett did not deny Plaintiff reasonable accommodation.** In November 2017, after careful review of Mr. Sowers's restrictions as indicated by his physician, Bassett informed Mr. Sowers that it did not have an open existing position for which Sowers was qualified and that would have permitted Sowers to work in a seated position for hours during the work day. This determination followed an interactive process in which: (1) Sowers provided Bassett

medical notification of his restrictions; (2) Bassett's review found no open positions; (3) Bassett then asked Sowers if he was familiar with any job at the plant that he would be able to do, and Sowers quickly responded that he was not;  and (4) Sowers then requested to work in the main office for Jeb Bassett, but Plant 11's HR Director, Jeannett Spencer, was not aware of any main office job for which Sowers was qualified or any open position reporting to Jeb Bassett. (*See* Spencer Affidavit at Exhibit 4.) Sowers himself acknowledged in his deposition that only management worked in the main office (*See* Sowers Deposition, p.117 at Exhibit 10.)

Sowers has failed to allege any evidentiary support for a claim that a position was open at Bassett for which he was qualified. As the EEOC has provided in its ADA accommodation guidance, an employer is "not required to create a position or to bump another employee in order to create a vacancy. Nor are you required to promote an employee with a disability to a higher level position." *See* EEOC guidance: "The ADA: Your Responsibilities as an Employer." [11] *See also* Gile v. United Airlines, Inc., 95 F.3d 492, 498 (7th Cir. 1996); Malabarba v. Chicago Tribune Co., 149 F.3d 690 (7th Cir. 1998) and Shiring v. Runyon, 90 F.3d 827, 832 (3rd Cir. 1996) (explaining that, for an employee to demonstrate that a reasonable accommodation was available, he would have to establish that "there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position" as the job the employee previously held). Mr. Sowers has alleged that he is aware that there have been others accommodated with light duty in the past. Even if this were accurate, there is no evidence to support a claim that, at the time of his request, there existed such open positions as would permit Bassett to accommodate him

---

[11]  Available on 6/22/20 at: https://www.eeoc.gov/publications/ada-your-responsibilities-employer

consistent with the dictates of the ADA.

Plaintiff Mr. Sowers has not indicated any open positions for which he was qualified and has thus failed to allege specific facts showing that there is a genuine issue for trial on whether Bassett had an open, existing position for which he was qualified, or – if such a position even existed – that an accommodation of him in the role would not be an undue hardship to Bassett.

**E.** **Plaintiff's ADA Interference Claim Fails because (1) Plaintiff failed to show he engaged in ADA-protected activities; (2) Plaintiff failed to show that Bassett coerced, threatened, intimidated, or interfered on account of protected activities and (3) Plaintiff failed to show that Bassett was motivated by an intent to discriminate.**

Any plaintiff seeking to prove an interference claim under the ADA must demonstrate: (1) he engaged in activities statutorily protected by the ADA; (2) he was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA-protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of protected activities; and (4) the defendants were motivated by an intent to discriminate. *See* Frakes v. Peoria Sch. Dist. No. 150, 872 F.3d 545 (7th Cir. 2017).

**1.** **Plaintiff failed to show he engaged in ADA-protected activities.**  As set forth in Section IV.C.1 plaintiff fails to allege specific facts showing that there is a genuine issue for trial on whether he was an individual with a disability at all relevant times. As such, Plaintiff consequently failed to show he engaged in ADA-protected activities, and the ADA interference claim must fail.  Clearly, Sowers did not hold himself out as disabled when he took a new job at Hooker Furniture just 3 days after leaving Bassett, nor when he applied for such position indicating

that he was free from disability and able to lift 50 pounds. *See* <u>Hooker records</u> attached hereto as Exhibit 2.

**2.      Plaintiff failed to show that Bassett coerced, threatened, intimidated, or interfered with him on account of protected activities**. Plaintiff fails to allege specific facts showing that there is a genuine issue for trial on whether Bassett coerced, threatened, intimidated, or interfered on account of protected activities. As set forth in Section IV.E.1 above, Plaintiff failed to allege specific facts showing a material issue for trial as to his meeting the statutory definition of disabled for the relevant times, and therefore did not engage in statutorily protected activity under the ADA. As there was no "protected activity," Bassett could not have violated any such right to "protected activity."

Further, even if Plaintiff were to meet the eligibility requirements of a disability under the ADA, Plaintiff fails to allege specific facts in support of a claim that Bassett coerced, threatened, intimidated or interfered with him on account of protected activity. At best, Sowers alleges that one supervisor, Ellyson Frick, suggested Sowers was attempting to schedule an appointment to get out of doing an assigned task. Even assuming this were true, such suggestion lacks the motive of discrimination on account of any disability. It further bears no indicia of threat, intimidation or coercion, and the fact that Sowers attended the appointment that day anyway undermines any argument there was interference. Sowers therefore failed to specifically allege facts to raise a genuine material issue for trial that Bassett interfered with his engaging in a protected activity, and his claim for ADA interference must fail.

**3.  Plaintiff failed to show that Bassett was motivated by an intent to discriminate.**

Plaintiff fails to allege specific facts showing that there is a genuine issue for trial on

whether Bassett's employment actions was motivated by an intent to discriminate against him because of his alleged disability. Notably, the absence that Plaintiff indicates triggered negative action from Bassett (his attendance at his son's school orientation) is unrelated to any disability Sowers claims he suffered. While Sowers alleges without substantiation that Sherman Moran asked colleagues questions about Sowers' various absences, he failed to cite any fact showing that a discriminatory intent informed the questioning and failed to connect any employment action to such questions. On the contrary, in addition to citing his July 9, 2018, absence as an incident precipitating his demotion, Sowers himself indicated that Moran cited Sowers' failure to supervise feuding employees – whom Sowers stated he would not "babysit" – as a reason for his demotion.

Plaintiff's well-documented failures here – and the absence of direct or circumstantial evidence linking any alleged disability to Bassett's employment actions – do not permit Plaintiff to submit plausibly that discriminatory intent, rather than Plaintiff's numerous shortcomings, motivated Bassett's decisions to demote or discipline him.  In the absence of specific facts raising a genuine issue of material fact for trial as to whether Bassett was motivated by discriminatory intent, Plaintiff's ADA interference claim must fail.

## V.  **CONCLUSION**

For the reasons set forth above, Defendant Bassett Furniture Industries, Incorporated, maintains that it is entitled to judgment as a matter of law, and requests that the Court grant its motion for summary judgment with respect to Plaintiff's Complaint against Defendant.

BASSETT FURNITURE
INDUSTRIES, INCORPORATED


By Counsel


Counsel:

s/James A.L. Daniel, Esq.
Martha White Medley, Esq. (VSB #21171)
James A. L. Daniel, Esq. (VSB #03881)
DANIEL, MEDLEY & KIRBY, P.C.
Post Office Box 1192
Martinsville, VA  24114
(276) 666-1585
(276) 666-4046 Facsimile
mmedley@dmklawfirm.com
jdaniel@dmklawfirm.com


## CERTIFICATE OF COUNSEL

The undersigned hereby certifies that on the 23rd day of June, 2020, the foregoing was

sent to the following attorneys for the Plaintiff via the Court's electronic CM/ECF system.

Brittany M. Haddox, Esq. (VSB # 86416)
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
Monica L. Mroz, Esq. (VSB #65766)
STRELKA LAW OFFICE, PC
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA  24011


s/  James A.L. Daniel

Counsel