IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 27 2021

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

| | | |
|---|---|---|
| DEWEY S. SOWERS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:19cv00039 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BASSETT FURNITURE INDUSTRIES, | ) | By:    Hon. Thomas T. Cullen |
| INC., | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Dewey S. Sowers, Jr., alleges that his former employer,  Defendant Bassett Furniture Industries, Inc. ("Bassett"), improperly targeted, criticized, and ultimately forced him to resign his position following foot surgery, in violation of the Family Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA"). Although three of his claims fail due to a lack of factual support, two survive Defendant's motion for summary judgment and will be set for trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Dewey Sowers began working at Bassett Furniture Industries in 1988 and left in 1994. He returned to Bassett in 2013 as an auxiliary/floater in Plant 11 in Martinsville, was promoted to Group Leader/Lead Person within a year of his return, and received merit-based raises in 2015, 2016, and 2017.

On August 9, 2017, Sowers underwent surgery on his foot. He notified Bassett that he needed to be off work for recovery and that his physician would re-evaluate his status in four weeks. Bassett approved his request for short-term disability leave under FMLA.

Two weeks after his surgery, while he was still out on leave, Sherman Moran (Plant Superintendent) asked Sowers to attend a training seminar at Bassett. Moran told Sowers that Bassett would provide a chair and cushion so that he could rest his foot during the training. Sowers initially agreed to attend the training, but ultimately did not because of his level of pain that day. (Dep. of Dewey Sowers 36:4–38:2, June 16, 2020 [ECF No. 90-1].) According to Sowers, missing that training seminar was the turning point in his employment; he claims he was treated differently after that. (Id. at 165:9–23.)

On September 22, Sowers's physician released him to return to work with some restrictions (mostly seated work). According to Sowers, because Bassett had a "100% healed" policy, he was not permitted to return to work at that time. (*See also* Dep. of Jeannette Spencer 35:13–15, June 17, 2020 [ECF No. 90-3] ("That's in our employee handbook that you cannot return to work unless you have no restrictions.").)

On November 1, Sowers's physician cleared him to return to restricted work; specifically, Sowers would need a seated or limited-standing job. According to Bassett, there were no open positions for which he was qualified that met his physician's requirements. Jeannette Spencer, the Human Resources Director at Bassett, even asked Sowers if he was aware of any position that met these limitations, and he said no.

Thereafter, Sowers applied for and received long-term disability benefits from November 1, 2017, to January 26, 2018, through a Bassett-sponsored disability plan, and was granted further FMLA leave.

On January 4, 2018, Sowers's physician cleared him to return to a limited, 4-hour workday beginning January 8, and asked that Sowers be allowed to increase his workload as

tolerated, including permitting rest and elevation of his foot for 10 minutes every 2 hours.[1] In response, Spencer e-mailed others stating: "Do we have to put him back to work? Carter [Underwood, who oversaw both Bassett plants in Martinsville], Sherman [Moran, Plant Superintendent] and Ellyson [Frick, Sowers's direct supervisor] do not want to with these restrictions. We don't let anyone else return unless they have no restrictions." (ECF No. 90-14.) Sowers was denied permission to return at that time, subject to those restrictions.

On January 19, Sowers was again cleared to return to work 4 hours per day, 5 days a week, increasing his time at work each week until he reached a full 8-hour workday. (ECF No. 90-17.) Bassett agreed to let Sowers return to work with these modified restrictions. Sowers returned to work on January 29. He resumed full-time duties in March.

According to Sowers, when he returned to work, Sherman Moran questioned whether he was capable of doing his job since having surgery. Sowers quotes Moran as saying things like, "I don't think you are as good since your surgery," and "You are not moving as good after your surgery." (Sowers Dep. 168:8–19.) Sowers claims he was performing up to expectations, but Bassett disagrees, citing an incident where Sowers allegedly told Moran he would not supervise two employees because he was not going to "'babysit' other employees." (Aff. of Sherman Moran, June 17, 2020 [ECF No. 83-3].)

On July 9, 2018, Sowers left a voicemail for Jeannette Spencer informing her that he would not be at work that day so that he could attend his son's college orientation. The next day, Moran called Sowers to Human Resources to discuss his work performance. At that time, Moran demoted Sowers. According to Sowers, up until "that day," Bassett had been "great"

---

[1] Sowers contends Bassett employees take breaks every 2 ½ hours during a normal workday.

to him.[2] (Sowers Dep. 76:21–77:3.) Sowers was demoted from Lead Person and his hourly rate of pay was reduced. According to Sowers, he was demoted for attendance issues without a written warning, in violation of Bassett's employee handbook.[3] Bassett contends he was demoted for performance issues. (ECF No. 83-1.) In any event, Sowers maintains Bassett's reasons for his demotion are pretextual.

On July 20, Sowers had an emergency doctor's appointment due to a throat issue.[4] Sowers testified that Ellyson Frick accused Sowers of getting a doctor's appointment to avoid having to work. (Sowers Dep. 110: 18–19.)

On July 23, Sowers presented Bassett with a note from his physician for the emergency appointment when he had to miss work three days before. That same day, he was suspended for a week without pay. Sowers contends he was suspended because he attended a medical appointment; Bassett counters Sowers was suspended for an incident of insubordination when Sowers told Frick he would not perform a task as instructed because he was not being paid to do it. (*See* ECF No. 83-1.)

On August 10, Sowers filed a charge of discrimination with the EEOC alleging failure to accommodate under the ADA from August 1, 2017, through January 31, 2018. After his

---

[2] This is at odds with his deposition testimony where he contended "everything changed" for him when he failed to attend the training session two weeks after his surgery.

[3] In a July 11, 2018, email to Jeb Bassett, Chief Operating Officer of Bassett, Sowers contends Eddie White, Vice President of Human Resources, told him that Moran had an issue with his attendance. Sowers maintains the bulk of his absences were for medical reasons.

[4] While on the way to work, Sowers choked on his breakfast, which caused bleeding in his throat. Because Sowers suffers from esophageal varices, he avers such bleeding could become life threatening.

demotion and suspension, Sowers began looking for other employment. He resigned his position at Bassett on October 12, 2018.

In his complaint, Sowers raises five causes of action: discrimination and retaliation under FMLA (count one); interference under FMLA (count two); discrimination and retaliation under ADA (count three); failure to accommodate under ADA (count four); and interference under ADA (count five). Bassett moved for summary judgment on all counts.

Bassett's Motion for Summary Judgment was argued to the Hon. Jackson L. Kiser on July 21, 2020. At that hearing, Judge Kiser disclosed to the parties a potential conflict of interest and informed the parties that, although he did not believe it to be a conflict, he would recuse himself if either party wished; neither party requested that Judge Kiser recuse himself. A few days later, however, Sowers changed his mind and filed a motion for recusal. (ECF No. 106.) Judge Kiser granted the motion (ECF No. 124) and transferred this case to the Hon. James P. Jones. When the undersigned was confirmed to this court, the case was transferred again. (ECF No. 133.) The court has reviewed the entire record of the proceedings to date, including the transcripts of the motion hearing before Judge Kiser, and it does not believe that additional argument on this motion is necessary. On December 11, 2020, the court informed the parties that it would rule on the summary-judgment motion on the basis of the pleadings, evidence, and argument already in the record. (Order, Dec. 11, 2020 [ECF No. 150].)

## SUMMARY JUDGMENT STANDARD

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of

evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party

must show that "there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary

judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving

party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir.

1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot

grant summary judgment unless there is "no genuine issue as to the inferences to be drawn

from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

## DISCUSSION

### A.  Count One: FMLA Discrimination/Retaliation

"To establish a prima facie claim under the FMLA, the plaintiff must demonstrate 'that

he engaged in a protected activity, that the employer took adverse action against him, and that

the adverse action was causally connected to the plaintiff's protected activity." *Waag v. Sotera

Defense Solutions, Inc.*, 857 F.3d 179, 191 (4th Cir. 2017) (quoting *Sharif v. United Airlines, Inc.*,

841 F.3d 199, 203 (4th Cir. 2016)).

> If the plaintiff produces sufficient evidence to establish a prima
> facie case, then a presumption of retaliation arises and the
> 'burden of production then shifts to the employer to rebut the
> . . . presumption of retaliation and provide [a] legitimate,
> nondiscriminatory reason for the adverse employment action.' If
> the employer rebuts the presumption of retaliation, then 'the
> plaintiff resumes the burden of persuading the factfinder that the
> employer's proffered explanation is merely a pretext for
> [retaliation],' which the plaintiff can do 'by showing either that
> the employer's explanation is not credible, or that the employer's
> decision was more likely the result of retaliation.

*Id.* at 191–92 (quoting *Sharif*, 841 F.3d at 203). "[T]o survive summary judgment on an FMLA retaliation claim, 'the plaintiff must produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason, i.e., retaliation.'" *Id.* at 192 (quoting *Sharif*, 841 F.3d at 203).

In the present case, there is some evidence that Moran was angry at Sowers for missing the training seminar while he was out on approved FMLA leave. Mrs. Sowers testified that, when she went to pick up her husband's paycheck while he was out on FMLA leave, Moran told her that both he and Jeb Bassett were "upset" that Sowers had missed the training session and they felt he could have made it. (Dep. of Drimeta Sowers 10:9–22, June 16, 2020 [ECF No. 90-2].) Accepting that testimony as true, Sowers took FMLA leave to which he was entitled (a protected activity), he was later demoted, and the supervisor who demoted him had said that he was "angry" Sowers did not attend a meeting during his leave.

While this evidence appears to establish a prima facie case of retaliation, the long interval between Sowers's leave and his demotion undermines his FMLA claim. The conversation between Mrs. Sowers and Moran occurred in late August or early September 2017, and Sowers was not demoted until July 2018. Such a long temporal lapse between a protected activity and the adverse employment action cuts strongly against finding any causal connection between the two events. *See, e.g.*, *Waag*, 857 F.3d at 192 (noting that close temporal proximity *may* suffice to demonstrate causation in an FMLA retaliation action); *King v. Pulaski Cnty. Sch. Bd.*, 195 F. Supp. 3d 873, 885 (W.D. Va. 2016) (examining temporal proximity in a retaliation claim under Title VII).

But even if the court were to set aside the substantial time that elapsed between any protected activity and the alleged adverse employment action and find that Sowers has established a prima facie case of retaliation, Sowers still "bears the burden of establishing that [Bassett's] proffered explanation is pretext for FMLA retaliation." *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006). "FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973)." *Id.* Once Sowers "puts forth sufficient evidence to establish a prima facie case of retaliation"—which, as stated, the court is not persuaded he has done—Bassett may then offer "a non-discriminatory explanation" for its action, and Sowers then "bears the burden to establish that the employer's proffered explanation is pretext for FMLA retaliation." *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001).

Bassett contends that Sowers's poor attitude and performance were the reasons for his demotion, and the undisputed evidence in the record supports this. In sworn affidavits filed with the court, Sowers's supervisors were unanimous in their testimony that Sowers was not performing his job as required. Ellyson Frick, Plaintiff's direct supervisor, stated that, in the position of Lead Person, it is important "to supervise the entire line," but that shortly after his promotion to Lead Person, Sowers "started neglecting some of the duties of that position." (Aff. of Claude E. Frick, June 17, 2020 [ECF No. 83-5].) Frick noted that Sowers "tended to stay in one place instead of supervising the entire line." *Id.* Sherman Moran, the Plant Superintendent, confirmed that Sowers's performance as Lead Person was "poor." (Aff. of Sherman Moran, June 17, 2020 [ECF No. 83-3].) Even Carter Underwood, who oversaw both

of Bassett's plants in Henry County, noted that Sowers simply "would not walk the entire line to supervise all the different workers," and that Sowers "was simply not performing the job as lead person." (Aff. of J. Carter Underwood, June 21, 2020 [ECF No. 83-6].) Jeannette Spencer noted that Sowers's "inadequate performance" was discussed at several management meetings, and that Sowers was counseled multiple times for his poor performance. (*See* Aff. of Jeannette Spencer, June 22, 2020 [ECF No. 83-4] ("I was in several meetings with Mr. Sowers, Mr. Moran, and Mr. Frick in which Mr. Sowers's inadequate performance was discussed. He was told during those sessions that if his performance did not improve, he would be demoted . . . ."); Frick Aff. ("I talked to [Sowers] on several occasions about his deficiencies and Sherman Moran and I talked to him also. On occasion when I talked to Mr. Sowers about the necessity of improving his job performance, he would tell me that he did not want to be in supervision."); Moran Aff.  ("I had to talk to Mr. Sowers on numerous occasions about his poor performance as a lead person. . . . Sowers's poor performance had been brought to his attention several times before he had surgery on his foot in the summer of 2017.").

Having proffered a legitimate, non-discriminatory reason for his demotion, the burden shifts back to Sowers to demonstrate that Basset's reason is false, and that retaliation was its true motivation. He has not offered persuasive evidence to meet this burden. He argues that the write-ups he received were created after-the-fact to conceal Bassett's true motivations, and points to  Frick's testimony that Moran was upset about Sowers's medical absences. (*See, e.g.*, Dep. of Claude Frick 18:11–18, June 17, 2020 [ECF No. 90-4].) Neither of these arguments is persuasive.

As to the write-ups, Sowers argued that the Personnel Action Forms were fabricated to hide Bassett's improper motives. He argues that Bassett violated its own policy by not having Sowers sign the Personnel Action Forms or noting his refusal to sign them. (*See* Dep. of Jeannette Spencer 18:10–16, June 17, 2020 [ECF No. 90-3]). But the very evidence he cites cuts against the argument he makes. The Personnel Action Forms from his personnel file (ECF Nos. 83-1, 90-26) do not contain a place for a disciplined employee to sign. There are signature blocks for "Plant Manager" (both were signed by J. Carter Underwood), "Human Resources Manager" (both were signed by Jeannette Spencer), "Functional Vice President" (unsigned), and "Executive Approval" (unsigned). Simply put, although Spencer might routinely have had an employee sign a Personnel Action Form, Sowers has not offered any evidence that it is required under company policy. Given this, and the lack of any other evidence, Sowers cannot establish the inference of a coverup.

With regard to Frick's testimony about Moran, Sowers has failed to establish that the issues Moran may have had with Sowers taking medical leave motivated his later demotion. It is surely a burden on any employer when an employee takes leave, but the law does not preclude recognizing this hardship; it only requires the employer to bear it. *Cf. Patel v. SOVAH Health Danville, CI*, Civil Action No. 4:18-cv-00065, at *6 (W.D. Va. July 9, 2020) ("Plaintiff's interpretation of USERRA would grossly expand its reach to include even the acknowledgment that employing individuals with active service commitments may, on occasion, create a hardship for the employer. There is no doubt that is true and USERRA requires employers to shoulder that burden and not punish the service member for it, but it does not render unlawful its mere acknowledgement."). Absent any evidence that Moran's

opinions about Sowers's medical absences were the true motivation for his actions 10 months later, Sowers has failed to present evidence to substantiate his claim.[5]

In sum, Bassett has presented evidence that Sowers was demoted not for his absences, but for poor attitude and performance. (*See, e.g.*, ECF No. 90-26, listing "[u]nsatisfactory job performance or a supervisor" as the reason for Sowers's demotion). While Sowers may disagree with that determination, he has not pointed to any evidence to suggest that the evidence is not true or that retaliation for taking FMLA leave was Bassett's actual motivation. Thus, even if the court were to grant that Sowers has established a prima facie case of retaliation, Sowers has not presented any evidence to rebut Bassett's stated justification for its actions.

Bassett also claims that, prior to his demotion, Sowers had not worked the required number of hours to be protected by the FMLA. Sowers asserts, without support, that it is "obvious" that he worked the requisite number of hours, but he has failed to present any evidence on this point, and thus has failed on a required element of proof. Insofar as Sowers alleges any retaliation for absences he took *after* his return to full-time work in January (such as demoting him for attending an emergency medical appointment for his throat), he has failed to show that he was entitled to FMLA leave, and thus entitled to its protections. *See* Fed. R. Civ. P. 56(e)(2) (noting the district court may consider a fact undisputed if the opposition fails to support its position with evidence).

---

[5] As discussed more thoroughly later in this opinion, Sowers has also failed to establish that he was covered by the FMLA at the time of his demotion, as he has failed to show that he worked the requisite number of hours to qualify.

Because Sowers has not presented evidence to rebut Bassett's proffered reason for its actions, and because Sowers has failed to offer evidence to suggest, let alone establish, that he was entitled to the protections of FMLA after he returned to work in January, the court will grant Bassett's motion for summary judgment on Count One.

B.  Count Two: FMLA Interference

"To establish unlawful interference with an entitlement to FMLA benefits, an employee must show that: (1) he was an eligible employee, (2) his employer was covered by the Act, (3) he was entitled to leave under the FMLA, (4) he gave his employer adequate notice of his intention to take leave, and (5) the employer denied him FMLA benefits to which he was entitled." *McKay v. Med. Univ. of S. Carolina*, C/A 2:17-45-RMG-BM, 2017 WL 9250345, at *5 (D.S.C. July 19, 2017). Furthermore, "[i]n order to establish a FMLA interference claim, Plaintiff has to prove not only interference, but that the violation prejudiced [him]." *Anderson v. Discovery Commc'ns*, LLC, 517 F. App'x 190, 197 (4th Cir. 2013) .

As stated above, Sowers has failed to show that, after his return to work in January 2018, he was entitled to FMLA benefits. Accordingly, any claim for interference must fail as he has not shown an entitlement to further FMLA leave.[6]

Insofar as the request that he attend a meeting during his FMLA leave is concerned, Sowers has not shown any prejudice. First, he did not actually attend the meeting. His pay was not docked, and he suffered no actual consequences. Much like there is no causal connection

---

[6] Any retribution taken by Bassett against Sowers for the emergency medical appointment in July 2018 is unrelated to the medical issue for which he requested, and was granted, FMLA leave. That former leave addressed his hammertoe; the emergency medical appointment addressed a later throat issue. At the time he had an issue with his throat, he has not shown he qualified for FMLA leave.

between Moran's statements in fall 2018 and Sowers's alleged constructive discharge 10 months later, there is no evidence of prejudice associated with the request that Sowers attend a meeting while out on approved FMLA leave. Sowers's supervisors may have been disappointed that he did not attend, but he has not established that they acted on that sentiment in violation of the law. The court will grant summary judgment on Count Two as well.

### C. Count Three: ADA Discrimination/Retaliation

"To establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). "When those elements are satisfied, the burden shifts to the employer to rebut the presumption of retaliation by articulating a legitimate non-retaliatory reason for its actions. If the employer satisfies that burden, the plaintiff must demonstrate that the proffered reason is a pre-text for forbidden retaliation." *Coursey v. Univ. of Maryland E. Shore*, 577 F. App'x 167, 175 (4th Cir. 2014).

Sowers seems to lump his FMLA and ADA retaliation claims together, which would mean that his ADA retaliation claim fails for the same reasons. But even if he argued these claims separately, he has failed to offer any evidence that his demotion was in retaliation for a protected activity under the ADA.

In his brief, Sowers points to only two actions[7] that could reasonably be considered protected activities under the ADA: he asked for a reasonable accommodation, and he complained of discrimination. As to the first, there is nothing in the record to suggest that Sowers's demotion was connected to his request for accommodations (one followed approximately 6 months after the other, a temporal lapse that undercuts any causal relationship). Sowers has not pointed to any evidence suggesting animus towards Sowers for requesting an accommodation; in fact, Bassett went to extra lengths to secure him long-term disability and additional leave when he could not return to work.[8]

As to his complaint with the EEOC, the only adverse action that followed that was his alleged constructive discharge. For constructive discharge to occur, the employee must have been subjected to objectively intolerable working conditions. "A constructive discharge—an allegation that the employer made the employee's working conditions so intolerable that []he was forced to quit [his] job—may constitute an adverse employment action. To prove a constructive discharge, a plaintiff must show: (1) that the employer's actions were deliberate, and (2) that working conditions were intolerable." *Lacasse v. Didlake, Inc.*, 712 F. App'x 231, 239 (4th Cir. 2018). The question of intolerability is examined "from the objective perspective

---

[7] Sowers says his request for FMLA leave was a protected activity, which it is under FMLA, but requesting FMLA leave is not a protected activity under the ADA. *See* 42 U.S.C. § 12203(a) (2020) ("No person shall discriminate against any individual because such individual has opposed any act or practice *made unlawful by this chapter* or because such individual made a charge, testified, assisted, or participated in any manner in an investigation proceeding, or hearing *under this chapter.*" (emphasis added)); *see also Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 430 (4th Cir. 2015) ("The ADA forbids employers from discriminating against persons with disabilities. The Act also bars employers from retaliating against employees *from seeking these statutory protections.*" (emphasis added)). *Cf. Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) ("Filing a workers' compensation claim is not something that is covered by the ADA, but rather by retaliation provisions under state law.").

[8] This does not undercut Sowers' claim for failure to accommodate; it only highlights the ineluctable conclusion that retaliation was not Bassett's motivation.

of a reasonable person." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (citing *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004). "[M]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004).

The most that can be said about Sowers's working conditions after he filed a complaint with the EEOC[9] is that he was dissatisfied with his working conditions and felt unfairly criticized. Although he believed that his supervisors were talking behind his back, the undisputed evidence in the record is that any such comments predated his complaint to the EEOC. Because Sowers has not offered evidence of intolerable working conditions, the court finds he has not shown a constructive discharge—and thus he has not proven an adverse employment action—following a protected activity. He has, in sum, failed to present evidence on a vital element of this claim, and the court will grant Bassett's motion for summary judgment on Count Three.

D. Count Four: ADA Failure to Accommodate

Sowers's failure-to-accommodate claim under the ADA is a different matter. "[I]n order for a plaintiff to establish a prima facie case against his employer for failure to accommodate under the ADA, the plaintiff must show: '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with a reasonable accommodation he could perform the essential functions of the

_____

[9] Sowers does not offer any evidence of his working conditions specific to the period between his filing a complaint with the EEOC (August 2018) and his resignation in October.

position . . . ; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar General Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (quoting *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

At the time of his leave, Sowers was disabled within the meaning of the ADA; his hammertoe surgery left him substantially limited the major life activity of walking. *See* 29 C.F.R. § 1630.2(i)(1)(i) (listing "walking" as a major life activity). Bassett was plainly on notice of this disability, as it had worked with him to secure long-term disability coverage under its insurance policy. According to Sowers's physician, at some point during his disability, he was able to perform the job if given the opportunity to rest 10 minutes every 2 hours, an accommodation that was reasonable since Bassett employees take breaks every 2.5 hours. *See Merrill v. McCarthy*, 184 F. Supp. 3d 221, 239 (E.D.N.C. 2016) ("To survive summary judgment [on the reasonableness of an accommodation], plaintiff is 'required to present evidence from which a jury may infer that the [proposed] accommodation is reasonable on its face, i.e., ordinary or in the run of cases. A reasonable accommodation is one that is feasible or plausible.'" (quoting *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 414 (4th Cir. 2015)). Despite this reasonable accommodation, Bassett did not permit Sowers to return to work. On those facts, the court finds Sowers has presented sufficient evidence to send his failure-to-accommodate claim to a jury. *See Cathey v. Wake Forest Uni. Baptist Med. Ctr.*, 90 F. Supp. 3d 493, 507 (M.D.N.C. 2015) ("Based on the evidence Cathey has presented, a reasonable jury could conclude that Baptist refused to make a reasonable accommodation of her hearing disability."); *Hurst v. St. Mary's Hosp. of Huntington, Inc.*, 867 F. Supp. 435, 440 (S.D.W. Va. 1994) (concluding that a plaintiff had presented sufficient evidence that she could perform her job with a reasonable

accommodation and denying summary judgment); *see also Hennagir v. Utah Dept. of Corr.*, 587 F.3d 1255, 1264 (10th Cir. 2009) ("At the summary judgment stage, the relevant inquiry in determining whether Plaintiff is qualified is whether he has provided evidence that she can be reasonably accommodated . . . ." (cleaned up)). Because this claim survives in some form, it is unnecessary to determine, at this time, whether any other prior proposed accommodation (such as an office job, a position where Sowers could sit most of the day, etc.) was reasonable or available during Sowers's leave. The court will therefore deny Bassett's motion for summary judgment on Count Four.

### E.  Count Five: ADA Interference

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b). In order to state a claim for ADA interference, a plaintiff must show: "(1) []he engaged in an activity that is statutorily protected by the ADA; (2) []he was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of [his] protected activity; and (4) the defendants were motivated by an intent to discriminate." *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017).

Sowers asserts that requesting an accommodation was his protected activity, and he is undoubtedly correct: "A request for an accommodation is a protected activity." *Kelly v. Town of Abingdon*, No. 1:19cv00032, 2020 WL 2553614, at *7 (W.D. Va. May 20, 2020). He contends

that the denial of his request, followed by his demotion six months later and alleged constructive discharge eight months later (discussed previously), "interfered" with his rights under the ADA. This argument is unpersuasive, as Sowers's claim for "interference" would be indistinguishable from a standard failure-to-accommodate claim. Though some overlap between the causes of action is likely, Sowers's argument would transform *every* failure-to-accommodate claim into an interference claim. Looking past Sowers's flawed legal theory, however, Bassett's "100% healed" policy requires further consideration.

Interference claims under the ADA are relatively rare, as evidenced by the dearth of appellate cases outlining its elements. *See id.* ("There are few appellate decisions construing this subsection."). The EEOC has issued guidance on what constitutes "interference," noting that the scope of the anti-interference section is "broader" than the anti-retaliation provision:

> In addition to retaliation, the ADA prohibits "interference" with the exercise or enjoyment of ADA rights, or with the assistance of another in exercising or enjoying those rights. The scope of the interference provision is broader than the anti-retaliation provision. It protects any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights. 42 U.S.C. § 12203(b). As with ADA retaliation, an applicant or employee need not establish that he is an "individual with a disability" or "qualified" in order to prove interference under the ADA.
>
> The statute, regulations, and court decisions have not separately defined the terms "coerce," "intimidate," "threaten," and "interfere." Rather, as a group, these terms have been interpreted to include at least certain types of actions which, whether or not they rise to the level of unlawful retaliation, are nevertheless actionable as interference.
>
> Of course, many instances of employer threats or coercion might in and of themselves be actionable under the ADA as a denial of accommodation, discrimination, or retaliation, and many examples in this section could be actionable under those theories

of liability as well. Because the "interference" provision is broader, however, it will reach even those instances when conduct does not meet the "materially adverse" standard required for retaliation. Examples of conduct by an employer prohibited under the ADA as interference would include:

• coercing an individual to relinquish or forgo an accommodation to which he or she is otherwise entitled;

• intimidating an applicant from requesting accommodation for the application process by indicating that such a request will result in the applicant not being hired;

• threatening an employee with loss of employment or other adverse treatment if he does not "voluntarily" submit to a medical examination or inquiry that is otherwise prohibited under the statute;

• issuing a policy or requirement that purports to limit an employee's rights to invoke ADA protections (e.g., a fixed leave policy that states "no exceptions will be made for any reason");

• interfering with a former employee's right to file an ADA lawsuit against the former employer by stating that a negative job reference will be given to prospective employers if the suit is filed; and

• subjecting an employee to unwarranted discipline, demotion, or other adverse treatment because he assisted a coworker in requesting reasonable accommodation.

The interference provision does not apply to any and all conduct or statements that an individual finds intimidating. In the Commission's view, it only prohibits conduct that is reasonably likely to interfere with the exercise or enjoyment of ADA rights.

EEOC Enforcement Guidance on Retaliation and Related Issues, 2016 WL 4688886, at *26–

27 (Aug. 25, 2016). Although the EEOC's guidance is not controlling, it is entitled to some

deference. *See Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 136 (1997) (noting that reasonable

agency interpretations carry "at least some added persuasive force" where *Chevron* is

inapplicable); *Reno v. Koray*, 515 U.S. 50, 61 (1995) (according "some deference" to an interpretive rule that "do[es] not require notice and comment").

Here, Jeannette Spencer testified that, at least while Sowers was an employee there, Bassett had a "100% healed policy." Although Sowers has not presented evidence of the policy's memorialization anywhere, several employees testified to its existence, and Spencer testified the policy was in the Bassett employee handbook. (*See also* ECF No. 83-1 p.13 (noting that Sowers would "need to be released full-duty without restrictions/limitations to return to work").) Such a policy could very well be considered "a policy or requirement that purports to limit an employee's rights to invoke ADA protections (e.g., a fixed leave policy that states 'no exceptions will be made for any reason')," which the EEOC considers a violation of the ADA's interference provisions. A policy that requires an employee to be "100% healed" before returning to work could reasonably interfere with an individual's rights under the ADA by effectively coercing them not to make a request for an accommodation because any such request would be denied. *Accord McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) ("'100% healed' policies are per se violations of the ADA."). The ADA requires an individualized assessment of each employee and his requested accommodation, and it prohibits the practice of precluding disabled individuals from returning to work in every instance until they are 100% healed. *See Gardenhire v. Manville*, 722 F. App'x 835, 839–40 (10th Cir. 2018); *Powers v. USF Holland, Inc.*, 667 F.3d 815, 824 (7th Cir. 2011); *Hohider v. United Parcel Serv., Inc.*, 564 F.3d 169, 195–96 (3rd Cir. 2009); *Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir. 2001). *But see Wilburn v. City of Roanoke*, Civil Action No. 7:14-CV-00255, 2015 WL 5089242, at *5 n.2 (W.D. Va. Aug. 27, 2015) (recognizing the Fourth Circuit has not opined

on whether a "100% healed" policy is a *per se* violation of the ADA). Accordingly, the court finds that Sowers has presented evidence that Bassett's "100% healed" policy was unlawful interference under the ADA, and the court will deny summary judgment on Count Five.

## CONCLUSION

For the reasons stated herein, Bassett is entitled to summary judgment on Counts 1–3. Sowers has presented sufficient evidence for his claims for a failure to accommodate and interference under the ADA (Counts 4 and 5) to go forward. Those claims can be presented to a jury.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 27th day of January, 2021.


_/s/ Thomas T. Cullen_
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE